AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
NOV 27 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One Black Motorola Moto Cellphone
FP&F: 2019250400242001 & 2019250400242002

Case No. 19MJ5312

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

located in the Southern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Methamphetamine |

The application is based on these facts:

See attached affidavit of HSI Special Agent Christopher Baldwin

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: __________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Christopher Baldwin, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/27/19

[signature]
*Judge's signature*

City and state: San Diego, California

Hon. Jill L. Burkhardt, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Special Agent Christopher Baldwin, being duly sworn, hereby state as follows:

**INTRODUCTION**

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

One Black Motorola Moto Cellphone
FP&F: 2019250400242001 & 2019250400242002
(**Target Device 1**)

One Black Alcatel Onetouch Cellphone
FP&F: 2019250400242001 & 2019250400242002
(**Target Device 2**)

(collectively the **Target Devices**) as further described in Attachments A1-A2, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952 and 960, as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Yanet VARELA Aguirre and Ariana REAL Larios for importing approximately 48.1 kilograms of methamphetamine from Mexico into the United States. *See USA v. Varela Aguirre et al.*, Case No. 19-mj-4040 (S.D. Cal.) at ECF No. 1 (Complaint). **Target Devices 1** and **2** are currently located at the HSI Vault, 2255 Niels Bohr Court, San Diego, California 92154.

3. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

**BACKGROUND**

4. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since April 2016. I am a graduate of the Criminal Investigator

Training Program and HSI Special Agent Training at the Federal Law Enforcement Training Center. Prior to being employed by HSI as a Special Agent, I was employed by the United States Border Patrol (USBP) for 13 years and am a graduate of the Border Patrol Academy. While employed as a Border Patrol Agent, I worked in various capacities including patrol, intelligence, and investigations. I conducted investigations of criminal violations relating to the smuggling of humans, contraband, firearms, money, and controlled substances, and the connections of those violations to transnational criminal organizations.

5. During my tenure with HSI, I have participated in the investigation of various drug trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. My current assignment is to a contraband smuggling group in San Diego, California that focuses on investigating criminal violations related to the illegal importation and trafficking of various types of contraband, including illegal narcotics, through the Ports of Entry and the connections of those violations to transnational criminal organizations.

6. I have also served as a Task Force Officer (TFO) with the U.S. Marshals Service (USMS) San Diego Regional Fugitive Task Force where I was cross-designated as a California State Peace Officer. As a TFO, I performed investigations into violations of state crimes in conjunction with my primary focus on locating fugitives from justice.

7. Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry. I am aware that it is common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones. Because they are mobile, the use of cellular telephones permits narcotics traffickers to easily carry out various tasks related to their trafficking activities, including, *e.g.*, remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and communicating with co-

conspirators who are transporting narcotics and/or proceeds from narcotics sales.

8. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in narcotics trafficking investigations, I am aware that individuals engaged in drug trafficking commonly store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in drug trafficking, as well as images and videos of drugs or contraband, proceeds and assets from drug trafficking, and communications to and from recruiters and organizers.

9. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance, from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10. On September 18, 2019, at approximately 3:25 p.m., VARELA, a Mexican citizen, applied for entry into the United States from Mexico through the San Ysidro Port of Entry. VARELA was the driver and registered owner of a grey Nissan Sentra (the Sentra) bearing Mexican license plate number A39NWN8. REAL, a Mexican citizen was seated in the front passenger seat of the Sentra. Neither passenger had valid immigration documents that would allow them to enter or remain in the United States legally. Customs and Border Protection Officer (CBPO) Richard Blue was conducting pre-primary roving patrol operations when he observed VARELA and REAL in the Sentra. CBPO Blue received two negative customs declarations and began inspecting the Sentra. CBPO Blue discovered silver duct-taped packages in the driver's-side quarter panel. VARELA and REAL were detained and escorted to secondary inspection. CBPO Orlando Perez responded to the Sentra with his assigned Human Narcotics Detector Dog (HNDD) and conducted a search of the Sentra. The HNDD jumped into the front passenger door and alerted to the rear driver's-side quarter panel. The Sentra was referred to secondary inspection. CBPO Andrew Lu conducted a Z-Portal X-Ray scan of the Sentra and detected anomalies in the quarter panels of the vehicle.

11. CBPO Shirmelle Richards conducted a seizure inspection of the Sentra. The inspection resulted in the discovery of approximately 98 packages concealed throughout the Sentra, with a total approximate weight of 48.1 kilograms (106.04 pounds). A sample of the substance contained within the packages field-tested positive for the characteristics of methamphetamine. VARELA and REAL were placed under arrest. CBPO Richards seized the contraband, Sentra, and one cellphone from VARELA. An additional cellphone

was seized from REAL.

12. During the post-arrest interview, REAL and VARELA agreed to waive their *Miranda* rights. REAL admitted VARELA entered into an agreement with unknown individuals to smuggle narcotics from Mexico into the United States for $2,000. REAL further stated VARELA was in contact with these individuals via cellphone during their trip to the Border. REAL stated she intended to help VARELA, but she did not know they were going to enter the United States, or that there were narcotics in the vehicle at the time of their arrest. REAL stated she and VARELA thought about abandoning the vehicle somewhere in Tijuana, Mexico. REAL also stated VARELA was planning on entering the United States to establish a crossing pattern with the vehicle. REAL contradicted this statement by stating she believed they were going to the Consulate Office in Tijuana and they accidently entered the United States. REAL has no valid immigration documents to enter or remain in the United States legally. REAL stated that she was stupid to enter the vehicle with VARELA after knowing she had entered into an agreement to smuggle narcotics.

13. VARELA stated she altered her expired B1/B2 visa to trick narcotics traffickers into believing she could legally enter the United States. VARELA stated she entered into an agreement to smuggle narcotics for some unknown individuals but did not discuss payment. The unknown individuals paid $3,000 Pesos to update VARELA's Mexican passport, purchased the vehicle, and registered the vehicle in VARELA's name. VARELA stated that the unknown individuals followed her and REAL to the Border, and that they made threats by stating they meant serious business. VARELA stated she did not intend to enter the United States, nor did she have any knowledge of the narcotics within her vehicle at the time of her arrest. VARELA stated she was traveling to the Consulate Office to update her expired visa. VARELA has no valid immigration documents to enter or remain in the United States legally.

14. **Target Devices 1** through **2** were seized at the time of Defendants' arrests and annotated on Fines Penalties and Forfeitures number 2019250400242001 &

2019250400242002, line item 0004. **Target Devices 1** and **2** are currently located at the HSI Vault, 2255 Niels Bohr Court, San Diego, California 92154.

15. In light of the above facts, REAL's and VARELA's statements, and my own experience and training, there is probable cause to believe that VARELA and REAL were using the **Target Devices** to communicate with others to further the importation of illicit narcotics into the United States.

16. In my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendants, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on June 18, 2019, up to and including September 18, 2019.

**METHODOLOGY**

17. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards

inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

18. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

19. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

20. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

21. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of VARELA's and REAL's violations of Title 21, United States Code, Sections 952 and 960.

22. Because the **Target Devices** were seized at the time of Defendants' arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the

appropriate date range for this search is from June 18, 2019, up to and including September 18, 2019.

23. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A1-A2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Christopher Baldwin
Homeland Security Investigations (HSI)

Subscribed and sworn to before me this 27 day of November, 2019.

Hon. Jill L. Burkhardt
United States Magistrate Judge